**PUBLIC CITIZEN LITIGATION GROUP**

1600 20TH STREET, N.W.

WASHINGTON, D.C. 20009-1001

—

(202) 588-1000

**Leave to file GRANTED**

*Beryl A. Howell    3/24/2011*

**Beryl A. Howell            Date**
**United States District Judge**

March 8, 2011

Honorable Beryl A Howell
United States District Court
2300 Constitution Avenue, NW
Washington, D.C. 20001

**Re:**    *Call of the Wild Movie v. Does 1-1062*, No. 1:10-cv-00455
*Voltage Pictures v Does 1-5000*, No. 1:10-cv-00873

Dear Judge Howell:

Per your request at oral argument, I am attaching the two affidavits that Seth Schoen filed in this case. The file stamps at the top indicate where they appear in the record.

At oral argument, I mentioned the settlement demands that plaintiff's counsel typically send to Does once they are identified. I, therefore, attach a redacted copy of the settlement letter that the Dunlap firm sent to one of the Does, who contacted me because I represented a member of her[1] family many years ago. I redacted her name and identifying information lest she be singled out by plaintiff for special attention. Although the letter suggests that suit might be filed in her home jurisdiction, the overwhelming focus of the letter is on having to defend herself in this Court. Our experience with the Dunlap firm is that it maintains the image of proceeding in DC as long as possible; the reason is, we believe, that this intensifies unfair settlement pressure on the defendants.

I noted the Court's exchange with plaintiff's counsel about "cleaning up" the cases promptly. We firmly believe that the Court lacks personal jurisdiction of any of the Does whose IP addresses show them to be elsewhere; but I noted your Honor's skepticism. If the Court rules otherwise, at the very least the Court should order plaintiffs in these cases to dismiss the Does as soon as it obtains information from the ISP's placing them in specific districts other than DC. Otherwise, plaintiffs are just using the spectre of litigation in a far-away court for as long as possible to unfairly pressure Does into settling.

Sincerely yours,

Paul Alan Levy

cc: All counsel

---

[1]Per my longstanding practice in anonymity cases, I refer to Doe using the female gender generically, without intending to specify Doe's actual gender.

Printed on Recycled Paper

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CALL OF THE WILD MOVIE, LLC | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DOES 1-358 | ) ) | CA. 1:10-cv-00455-RMU |
| Defendant. | ) ) ) ) ) | |

## DECLARATION OF SETH SCHOEN

I, Seth Schoen, declare as follows:

1.       I am a Senior Staff Technologist with the Electronic Frontier Foundation (EFF), and I make this declaration on my own personal knowledge.

2.       The purpose of this declaration is to set forth facts, which were readily available to Plaintiff from free, public Internet sources at and before the time they filed suit, that establish that many of the unnamed defendants in the above-referenced case (hereinafter "Does") use Internet connections physically located far from this District and therefore are likely not located in this District.

3.       By reviewing Exhibit A to the First Amended Complaint, I compiled a list of the Internet Protocol (IP) addresses that Plaintiff attributes to each of the Doe defendants.

4.       There are many tools freely available to the public that help reveal where a person using a particular IP address is likely to be physically located. This process is often referred to as "geolocation." This information is commonly used for many purposes, such as customizing the language or content of web sites based on inferences about where visitors are accessing the site from.

5.       One means of learning about where an IP address is physically located is known as "reverse domain name service lookup" or "reverse DNS". When an Internet service provider

publishes database records assigning a human-readable "domain name" to each numerical IP address. The reverse lookup information can be obtained by anyone using a program such as "host", or with web-based tools such as the DNS lookup service at <http://emailstuff.org/>.

6.      One of the purposes of reverse DNS is to help interested parties learn more about what a computer is used for, what organization's network it is connected to, and, in many cases, where the computer is physically located. Typically, for home users of dial-up or broadband connections, such as DSL or cable-modem services, a domain name obtained from reverse DNS will identify which ISP assigned the IP address.

7.      In addition, such a domain name will frequently incorporate an approximate physical location, such as the name of a municipal area, state, or region. For example, one of the Does being sued here is identified by the IP address 71.84.122.109 and described by Plaintiff as a subscriber of Charter Communications. The reverse DNS database identifies this computer as 71-84-122-109.static.reno.nv.charter.com, confirming Plaintiff's suggestion that this Doe is a Charter customer, but adding the additional detail that the likely physical location of the computer is in or near Reno, Nevada. This means that in all likelihood, the individual who used this IP address is located in or near Reno, Nevada.

8.      I looked at 1,062 IP addresses that were referenced in this suit. For each of the 1,062 IP addresses alleged by Plaintiff to belong to a Doe defendant, I used the "host" program to perform a reverse lookup against the publicly-accessible reverse DNS service.

9.      The results of this process generally confirmed Plaintiff's association of particular IP addresses with particular ISPs. Additionally, the results of this process generally suggested a geographic location for most individual defendants. In other words, most of the Does listed in this lawsuit can be associated by the host reverse DNS look up with both an Internet service provider and a geographic location.

10.     For purposes of this Declaration, I separated out the addresses of those Does whom this method suggests are subscribers of Time Warner Cable's Road Runner service (rr.com). These Does are mostly identical to those listed as Road Runner subscribers in Exhibit A to the

Complaint.  I have attached hereto as Exhibit A to this Declaration a list of the reverse DNS names of Doe IP addresses that my investigations associated with the Road Runner Internet service.

11.    Reverse DNS records indicate that Does in this lawsuit include Time Warner Cable customers with Internet connections located in or near Hawaii; Maine; Southern California; New York City; the Tampa Bay Area in Florida; Buffalo, NY; Austin, TX; Cincinnati and Columbus, OH; and other states and regions.

12.    Reverse DNS records also indicate that Does in this lawsuit who are subscribers of other ISPs are similarly located in many different locations throughout the United States.

13.    In addition to reverse DNS information, another means of learning where an IP address is located is to use a public database operated by the American Registry for Internet Numbers ("ARIN database").  ARIN is the authority responsible for the initial allocation of IP addresses to ISPs located in the United States.  ARIN maintains public records indicating to whom a given IP address has been allocated.  Large ISPs, such as Time Warner Cable, may apply to ARIN multiple times to receive multiple "blocks" or ranges of IP addresses.  Each such block may be dedicated to a particular purpose or geographic area.

14.    The ARIN database can be searched using a public web site provided by ARIN, or by using a program called "whois".

15.    Because DSL and cable modem connections are provided from local hubs to users in a particular geographic region, there is good reason to believe that the geographic location data obtained by these methods actually reflects the physical location of the Internet connection, at least in general terms.  In other words, the geographic designations obtained by these methods likely indicate the approximate locations of the residences or other venues where the Does use their Internet-connected computers.

16.    In my experience, computer professionals are generally aware of the existence and function of the reverse DNS and whois services, and would use either or both when they needed to learn where a given IP address was physically located.  These techniques are readily and

easily available to Plaintiffs, their attorney, and to the computer professionals they have employed to perform the investigations leading to this lawsuit.

17.     Declarants for Plaintiff appeared to refer to the whois service or a related service when they explained how to determine which ISPs should receive subpoenas for customer information. See, e.g., Declaration of Patrick Achache at paragraph 13 ("[p]ublicly available databases located on the Internet list the IP address ranges assigned to various ISPs"). When Plaintiff's declarants used the whois service in this way, they would have been expressly presented with various geographic information that could have helped advise Plaintiff of where many Does were likely to be located. Indeed, Mr. Achache mentions that he can "trace the infringer's access to the Internet [...] in some instances, to a general geographic area." Id. at paragraph 12.

18.     For the IP addresses about which I was able to derive some location information, either through reverse DNS or through the ARIN database, it appears that no greater percentage of these individuals is located in or near Washington, D.C. than one would expect to be true in any random sampling of Americans. In other words, almost all of the individuals appear to be located outside of the D.C. area.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct and that this document was executed in Portland, Oregon.

Dated: June 1, 2010                             By: _____

**EXHIBIT A**

cpe-98-14-38-194.nyc.res.rr.com.

cpe-98-15-209-188.hvc.res.rr.com.

cpe-98-14-63-126.nyc.res.rr.com.

cpe-065-191-130-109.nc.res.rr.com.

cpe-76-90-238-213.socal.res.rr.com.

cpe-66-74-36-42.dc.res.rr.com.

161.171.101.97.cfl.res.rr.com.

cpe-24-209-52-95.neo.res.rr.com.

134.126.101.97.cfl.res.rr.com.

cpe-69-204-93-6.buffalo.res.rr.com.

cpe-174-100-126-166.neo.res.rr.com.

CPE-65-26-193-108.wi.res.rr.com.

cpe-76-83-213-84.dc.rr.com.

cpe-174-103-143-233.cinci.res.rr.com.

cpe-67-11-56-201.satx.res.rr.com.

cpe-66-91-228-208.san.res.rr.com.

149.25.33.65.cfl.res.rr.com.

cpe-069-133-151-185.nc.res.rr.com.

cpe-69-205-172-227.stny.res.rr.com.

cpe-72-179-181-38.satx.res.rr.com.

58.27.33.65.cfl.res.rr.com.

CPE-24-211-20-20.wi.res.rr.com.

cpe-71-72-74-41.columbus.res.rr.com.

cpe-071-068-234-086.sc.res.rr.com.

cpe-173-168-222-246.tampabay.res.rr.com.

53-11.26-24.tampabay.res.rr.com.

cpe-24-162-151-156.hot.res.rr.com.

cpe-98-154-68-73.socal.res.rr.com.

cpe-74-70-108-52.nycap.res.rr.com.

cpe-76-174-73-158.socal.res.rr.com.

136.64.204.68.cfl.res.rr.com.

cpe-76-174-126-228.socal.res.rr.com.

cpe-76-185-63-121.tx.res.rr.com.

cpe-174-100-142-168.neo.res.rr.com.

CPE-24-167-196-216.wi.res.rr.com.

26.47.119.70.cfl.res.rr.com.

cpe-74-77-226-241.buffalo.res.rr.com.

153-51.34-65.tampabay.res.rr.com.

cpe-24-59-114-219.twcny.res.rr.com.

cpe-67-240-123-176.nycap.res.rr.com.

rrcs-97-78-46-206.se.biz.rr.com.

CPE-70-92-227-223.wi.res.rr.com.

cpe-67-248-251-86.nycap.res.rr.com.

CPE-69-76-54-207.new.res.rr.com.

cpe-65-24-72-160.columbus.res.rr.com.

rrcs-24-129-187-202.se.biz.rr.com.

cpe-24-166-20-114.indy.res.rr.com.

cpe-68-174-45-115.hvc.res.rr.com.

166-215.97-97.tampabay.res.rr.com.

cpe-173-170-174-112.tampabay.res.rr.com.

cpe-98-157-192-61.ma.res.rr.com.

cpe-173-88-8-4.columbus.res.rr.com.

cpe-76-87-121-175.socal.res.rr.com.

cpe-98-151-194-184.socal.res.rr.com.

cpe-76-170-126-5.socal.res.rr.com.

cpe-66-67-61-142.rochester.res.rr.com.

cpe-76-177-191-184.we.res.rr.com.

rrcs-24-172-159-30.central.biz.rr.com.

161-132.207-68.elmore.res.rr.com.

cpe-24-90-192-232.nyc.res.rr.com.

cpe-065-190-155-056.nc.res.rr.com.

cpe-069-132-197-250.carolina.res.rr.com.

cpe-65-24-186-89.columbus.res.rr.com.

cpe-76-180-112-174.buffalo.res.rr.com.

cpe-67-244-150-50.rochester.res.rr.com.

cpe-71-65-115-204.woh.res.rr.com.

cpe-67-249-25-149.twcny.res.rr.com.

cpe-72-191-190-93.elp.res.rr.com.

cpe-024-088-096-155.sc.res.rr.com.

cpe-66-74-235-104.socal.res.rr.com.

cpe-74-78-153-105.twcny.res.rr.com.

239.66.101.97.cfl.res.rr.com.

107.114.33.65.cfl.res.rr.com.

cpe-069-132-051-007.carolina.res.rr.com.

cpe-65-26-127-18.kc.res.rr.com.

cpe-72-184-77-201.tampabay.res.rr.com.

cpe-72-129-73-219.socal.res.rr.com.

CPE-65-26-192-75.wi.res.rr.com.

cpe-75-185-186-133.neo.res.rr.com.

cpe-71-79-133-175.neo.res.rr.com.

cpe-98-150-175-71.hawaii.res.rr.com.

cpe-74-77-98-201.buffalo.res.rr.com.

cpe-76-188-31-169.neo.res.rr.com.

cpe-98-155-145-64.hawaii.res.rr.com.

cpe-98-150-132-161.hawaii.res.rr.com.

cpe-76-180-231-222.buffalo.res.rr.com.

191.215.101.97.cfl.res.rr.com.

cpe-24-161-138-49.hawaii.res.rr.com.

cpe-98-149-220-118.bak.res.rr.com.

cpe-066-056-130-011.sc.res.rr.com.

rrcs-70-62-68-55.midsouth.biz.rr.com.

cpe-71-79-189-187.neo.res.rr.com.

cpe-67-49-63-49.socal.res.rr.com.

cpe-74-79-87-89.twcny.res.rr.com.

cpe-065-190-044-026.nc.res.rr.com.

cpe-071-076-235-241.triad.res.rr.com.

cpe-173-88-174-76.neo.res.rr.com.

cpe-76-91-239-33.socal.res.rr.com.

cpe-76-190-153-105.neo.res.rr.com.

35.66.101.97.cfl.res.rr.com.

186.217.102.97.cfl.res.rr.com.

cpe-024-074-112-082.carolina.res.rr.com.

cpe-066-056-156-091.sc.res.rr.com.

cpe-67-249-17-235.twcny.res.rr.com.

cpe-024-163-010-135.triad.res.rr.com.

cpe-67-248-183-142.nycap.res.rr.com.

cpe-98-150-50-108.bak.res.rr.com.

cpe-98-154-233-100.socal.res.rr.com.

cpe-65-189-251-69.woh.res.rr.com.

132.102.118.70.cfl.res.rr.com.

cpe-66-91-7-63.hawaii.res.rr.com.

212.82.8.67.cfl.res.rr.com.

cpe-76-167-241-42.socal.res.rr.com.

cpe-24-27-106-253.tx.res.rr.com.

cpe-68-201-39-25.hot.res.rr.com.

cpe-66-66-158-155.rochester.res.rr.com.

238-117.126-70.tampabay.res.rr.com.

cpe-65-24-72-233.columbus.res.rr.com.

cpe-72-178-29-242.elp.res.rr.com.

240.88.103.97.cfl.res.rr.com.

cpe-174-101-24-176.columbus.res.rr.com.

rrcs-64-183-169-6.west.biz.rr.com.

mta-67-246-203-80.voip.maine.rr.com.

cpe-075-184-029-120.nc.res.rr.com.

cpe-67-240-125-25.nycap.res.rr.com.

cpe-76-190-196-17.neo.res.rr.com.

243.189.33.65.cfl.res.rr.com.

cpe-70-117-17-123.satx.res.rr.com.

cpe-76-83-245-145.dc.rr.com.

cpe-72-185-174-24.tampabay.res.rr.com.

cpe-75-184-117-113.indy.res.rr.com.

cpe-173-169-155-101.tampabay.res.rr.com.

cpe-75-187-193-140.neo.res.rr.com.

cpe-68-206-115-169.stx.res.rr.com.

cpe-071-076-234-003.triad.res.rr.com.

cpe-74-69-201-138.maine.res.rr.com.

cpe-67-240-36-105.nycap.res.rr.com.

cpe-075-183-184-024.sc.res.rr.com.

cpe-71-67-156-65.mi.res.rr.com.

61-252.126-70.tampabay.res.rr.com.

cpe-72-185-136-234.tampabay.res.rr.com.

cpe-75-185-209-171.woh.res.rr.com.

cpe-173-89-157-19.new.res.rr.com.

cpe-071-070-167-079.nc.res.rr.com.

cpe-98-157-83-220.ma.res.rr.com.

cpe-69-207-23-71.buffalo.res.rr.com.

cpe-67-249-28-130.twcny.res.rr.com.

cpe-98-157-75-237.ma.res.rr.com.

26.65.102.97.cfl.res.rr.com.

cpe-98-31-1-7.woh.res.rr.com.

cpe-76-168-186-183.socal.res.rr.com.

107.67.101.97.cfl.res.rr.com.

cpe-68-206-162-242.stx.res.rr.com.

cpe-76-179-159-52.maine.res.rr.com.

cpe-76-181-156-140.columbus.res.rr.com.

cpe-65-185-112-106.woh.res.rr.com.

cpe-075-183-022-125.triad.res.rr.com.

cpe-174-103-133-110.cinci.res.rr.com.

cpe-66-108-34-21.nyc.res.rr.com.

216.27.33.65.cfl.res.rr.com.

cpe-075-191-179-089.carolina.res.rr.com.

cpe-75-185-26-24.columbus.res.rr.com.

109-146.127-70.tampabay.res.rr.com.

cpe-65-185-112-156.woh.res.rr.com.

cpe-98-157-144-186.ma.res.rr.com.

rrcs-71-41-208-91.se.biz.rr.com.

cpe-65-27-196-123.cinci.res.rr.com.

cpe-173-095-170-089.nc.res.rr.com.

cpe-173-88-193-70.neo.res.rr.com.

cpe-72-231-172-207.nycap.res.rr.com.

cpe-71-65-14-28.mi.res.rr.com.

173-177.96-97.tampabay.res.rr.com.

cpe-075-183-185-195.sc.res.rr.com.

159.149.102.97.cfl.res.rr.com.

cpe-66-66-4-186.rochester.res.rr.com.

cpe-67-242-211-227.rochester.res.rr.com.

6.181.101.97.cfl.res.rr.com.

cpe-24-161-96-121.hvc.res.rr.com.

cpe-024-074-112-152.carolina.res.rr.com.

cpe-065-191-125-154.nc.res.rr.com.

199.24.33.65.cfl.res.rr.com.

cpe-70-95-191-202.hawaii.res.rr.com.

132-219.200-68.tampabay.res.rr.com.

201.66.101.97.cfl.res.rr.com.

cpe-76-181-23-131.columbus.res.rr.com.

cpe-71-72-198-79.cinci.res.rr.com.

cpe-65-25-17-59.neo.res.rr.com.

cpe-68-174-228-105.si.res.rr.com.

40.24.33.65.cfl.res.rr.com.

cpe-67-242-90-155.nycap.res.rr.com.

cpe-76-87-74-248.socal.res.rr.com.

152.67.101.97.cfl.res.rr.com.

cpe-65-29-93-84.indy.res.rr.com.

cpe-24-24-82-140.stny.res.rr.com.

cpe-67-250-15-129.nyc.res.rr.com.

cpe-66-91-195-119.hawaii.res.rr.com.

cpe-174-101-55-102.columbus.res.rr.com.

cpe-24-243-13-136.satx.res.rr.com.

cpe-66-61-99-201.neo.res.rr.com.

cpe-24-243-165-203.hot.res.rr.com.

cpe-66-108-16-18.nyc.res.rr.com.

cpe-76-189-152-100.neo.res.rr.com.

cpe-74-73-44-184.nyc.res.rr.com.

cpe-066-056-128-119.sc.res.rr.com.

cpe-68-175-21-136.nyc.res.rr.com.

cpe-68-174-13-245.si.res.rr.com.

cpe-024-074-112-116.carolina.res.rr.com.

cpe-204-210-141-120.hvc.res.rr.com.

cpe-98-30-84-77.woh.res.rr.com.

cpe-74-75-92-65.maine.res.rr.com.

cpe-97-104-159-88.cfl.res.rr.com.

cpe-76-169-47-90.socal.res.rr.com.

CPE-70-94-29-115.kc.res.rr.com.

cpe-24-193-47-247.nyc.res.rr.com.

cpe-173-168-186-43.tampabay.res.rr.com.

cpe-74-74-139-228.rochester.res.rr.com.

cpe-72-229-135-157.nyc.res.rr.com.

cpe-24-209-20-150.cinci.res.rr.com.

137.22.188.72.cfl.res.rr.com.

rrcs-24-173-191-130.sw.biz.rr.com.

cpe-075-181-015-105.carolina.res.rr.com.

cpe-65-189-234-50.indy.res.rr.com.

cpe-70-123-129-133.austin.res.rr.com.

CPE-70-94-48-190.kc.res.rr.com.

cpe-67-242-198-214.nycap.res.rr.com.

cpe-075-183-186-193.sc.res.rr.com.

cpe-72-225-213-26.nyc.res.rr.com.

CPE-75-86-244-194.wi.res.rr.com.

cpe-65-185-172-37.neo.res.rr.com.

182.82.119.70.cfl.res.rr.com.

cpe-72-228-81-135.twcny.res.rr.com.

CPE-72-133-56-2.new.res.rr.com.

cpe-174-102-70-229.woh.res.rr.com.

cpe-66-75-111-244.hawaii.res.rr.com.

cpe-74-69-58-200.rochester.res.rr.com.

cpe-075-181-165-134.carolina.res.rr.com.

cpe-24-166-17-104.indy.res.rr.com.

cpe-24-92-49-223.nycap.res.rr.com.

cpe-74-68-151-113.nyc.res.rr.com.

cpe-24-59-118-190.twcny.res.rr.com.

CPE-75-81-144-7.wi.res.rr.com.

mta-70-94-68-4.kc.res.rr.com.

cpe-24-170-54-110.stx.res.rr.com.

cpe-98-150-29-185.bak.res.rr.com.

cpe-173-171-177-83.tampabay.res.rr.com.

cpe-075-181-158-173.carolina.res.rr.com.

cpe-65-185-30-5.cinci.res.rr.com.

cpe-24-58-209-101.twcny.res.rr.com.

cpe-67-241-182-19.buffalo.res.rr.com.

cpe-98-30-38-43.woh.res.rr.com.

cpe-76-85-134-144.neb.res.rr.com.

cpe-72-178-160-132.rgv.res.rr.com.

cpe-72-231-21-84.nyc.res.rr.com.

45-34.187-72.tampabay.res.rr.com.

cpe-75-185-209-57.woh.res.rr.com.

cpe-24-29-248-237.neo.res.rr.com.

cpe-72-191-208-28.hot.res.rr.com.

cpe-76-95-134-233.socal.res.rr.com.

cpe-76-84-131-67.neb.res.rr.com.

cpe-174-103-130-175.cinci.res.rr.com.

cpe-76-83-126-42.bak.res.rr.com.

cpe-98-148-214-216.socal.res.rr.com.

cpe-24-162-214-54.elp.res.rr.com.

cpe-075-191-153-105.triad.res.rr.com.

cpe-071-070-082-152.sc.res.rr.com.

cpe-76-169-149-145.socal.res.rr.com.

cpe-174-099-007-252.nc.res.rr.com.

cpe-174-101-24-172.columbus.res.rr.com.

cpe-65-24-152-157.columbus.res.rr.com.

cpe-76-166-143-32.socal.res.rr.com.

cpe-70-94-238-33.sw.res.rr.com.

cpe-24-161-21-224.hvc.res.rr.com.

cpe-67-247-20-144.nyc.res.rr.com.

cpe-98-30-36-49.woh.res.rr.com.

cpe-24-210-108-131.mi.res.rr.com.

cpe-174-100-40-107.neo.res.rr.com.

cpe-65-25-32-33.neo.res.rr.com.

cpe-76-180-155-119.buffalo.res.rr.com.

cpe-74-79-132-240.twcny.res.rr.com.

206-245.96-97.tampabay.res.rr.com.

cpe-174-098-217-064.triad.res.rr.com.

cpe-72-225-188-164.nyc.res.rr.com.

48-107.125-70.bham.res.rr.com.

cpe-76-91-159-149.socal.res.rr.com.

cpe-24-175-222-209.rgv.res.rr.com.

cpe-70-112-167-64.austin.res.rr.com.

cpe-68-173-232-221.nyc.res.rr.com.

cpe-76-179-83-7.maine.res.rr.com.

cpe-74-75-90-138.maine.res.rr.com.

cpe-76-177-247-121.natcky.res.rr.com.

123-149.175-24.bham.res.rr.com.

cpe-24-193-68-128.nyc.res.rr.com.

159.243.8.67.cfl.res.rr.com.

cpe-71-74-111-25.neo.res.rr.com.

cpe-72-183-198-100.satx.res.rr.com.

rrcs-72-43-122-209.nyc.biz.rr.com.

cpe-67-248-139-110.nycap.res.rr.com.

cpe-66-27-77-137.san.res.rr.com.

cpe-024-074-085-246.carolina.res.rr.com.

cpe-98-157-209-180.ma.res.rr.com.

6-231.187-72.tampabay.res.rr.com.

89.150.204.68.cfl.res.rr.com.

cpe-76-87-73-83.socal.res.rr.com.

cpe-65-185-142-207.indy.res.rr.com.

cpe-72-130-205-36.hawaii.res.rr.com.

cpe-024-088-096-167.sc.res.rr.com.

cpe-68-172-216-67.hvc.res.rr.com.

cpe-76-189-95-160.neo.res.rr.com.

cpe-071-068-031-163.carolina.res.rr.com.

174-51.97-97.tampabay.res.rr.com.

90-95.207-68.panhandle.res.rr.com.

cpe-76-92-145-61.kc.res.rr.com.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CALL OF THE WILD MOVIE, LLC | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| DOES 1-1,062 | ) | CA. 1:10-cv-00455-RMU |
| Defendants. | ) | |

---

**DECLARATION OF SETH SCHOEN IN SUPPORT OF REPLY**

I, Seth Schoen, declare as follows:

1.      I am a Senior Staff Technologist with the Electronic Frontier Foundation (EFF), and I make this declaration on my own personal knowledge and if called upon to testify thereto, I could and would competently do so.

2.      I reviewed the Declaration of Patrick Achache in Support of Plaintiff's Statement of Good Cause, as well as Plaintiff's Statement of Good Cause, Docket No. 19-2. I also reviewed some of the academic research on BitTorrent, as indicated below.

3.      This Declaration responds to assertions made by the Plaintiff that might give a misleading impression of how unique BitTorrent is or how likely it is that various Defendants interacted with each other or were aware of each other in the course of uploading or downloading the motion picture whose copyright Plaintiff accuses them of infringing.

4.      First, Plaintiff has contrasted BitTorrent with other file sharing systems. For instance, as part of distinguishing BitTorrent from other systems, Plaintiff asserts that BitTorrent users

engage in both uploading and downloading of files, Statement of Good Cause at p. 6, that BitTorrent uses a technique called "swarming", Statement of Good Cause at p. 7, and that BitTorrent users have "knowledge that they are illegally downloading and/or distributing [the copyrighted work] to others." Statement of Good Cause at p. 11.

5.      BitTorrent is actually similar in these ways to file sharing systems that were at issue in previous litigation about peer-to-peer file sharing, and to the extent it is different, the differences result in less direct communication among users of the technology, not more.

6.      All peer-to-peer file sharing systems allow users to upload as well as download.  In all such systems, files could spread throughout the network over time, from one user to another. Hence, files can remain available to users of a peer-to-peer file sharing system even when the users who originally shared those files are no longer participating.

7.      BitTorrent is also not the only system that has a swarming or multi-source download feature in which users can download simultaneously from several other users.  Although this design was not a part of the earliest popular peer to peer systems such as Napster, it subsequently became quite widespread.  For instance, the Kazaa and Gnutella software that was at issue in several copyright infringement actions have a swarming download feature that works similarly to BitTorrent's. *See, e.g.,* L. Jean Camp, "Peer to Peer Systems," in Hossein Bidgoli (ed.), *The Internet Encyclopedia* (Wiley, 2004), vol. 3, at 30. ("In order to increase the speed of downloads and distribute the load on peer-provid[ed] files Limewire uses swarming transfers. Swarm downloading entails downloading different elements of files available on multiple low-bandwidth connections to obtain the equivalent service of a single broadband connection."); *see also* Alex Jantunen *et al.*, "Peer to Peer Analysis: State of the Art" (Tampere University of Technology, 2006) (noting that swarming supporting protocols include at least FastTrack, Gnutella, ED2K/Overnet and BitTorrent).

8.      In all peer-to-peer file sharing systems, some users are aware that they are uploading files as well as downloading them. Nothing about BitTorrent makes that more likely than with previous peer-to-peer systems.

9.     To the contrary, BitTorrent provides users with *less* ability to identify and communicate with the peers with whom they exchange files than other technologies do. For example, Napster and Kazaa, unlike BitTorrent, referred to each user by a human-intelligible and somewhat memorable screen name, instead of a number.  Napster and Kazaa have also offered users the ability to chat with one another.  BitTorrent does not offer these features.  There is no easy way for the various BitTorrent users who have uploaded or downloaded parts of a file to recognize, name, or communicate with one another.

10.     While BitTorrent client software, like other peer-to-peer file sharing software, may provide a way for a user to view the IP addresses of peers, users do not have to do so in order to use BitTorrent.  They do not have to select peers' IP addresses, because the selection of peers is done automatically.  Indeed, since BitTorrent automates so much of the download process, many users likely do not even know how BitTorrent works.  Most BitTorrent users have no reason to know how many or which other peers they might have communicated with in the course of downloading a file, or which addresses transmitted which portions of the file to them.

11.     For example, the main screen of the popular Azureus BitTorrent software shows only a progress bar for the download, indication the percentage of the download that is complete, without mentioning other any other peers or their Internet addresses.     *See, e.g.*, <http://torrent-search.us/images/torrent-clients/azureus-screenshot.jpg> (screenshot of Azureus software in the midst of a download).  Although interested users can learn about the role of peers or view their IP addresses, they are not required to do this.

12.     I do not believe Plaintiff's experts could have obtained direct evidence that any particular defendant shared portions of the copyrighted work at issue here with any particular other defendant, since BitTorrent does not provide a means for third parties to learn directly who is downloading files from whom.  Even the example presented by Mr. Achache, Achache Decl. at 6, shows only that five individuals were sharing the same file at the same time; whether those individuals interacted at all depends upon a variety of other factors, such as which parts of the file each needed and whether the BitTorrent tracker involved told any of these users about one

3

another (that is, whether any of these five users end up in one another's "peer sets").

13.    In support of the argument that users who are being sued together did interact by transferring parts of the file, Mr. Achache observes that "[w]ithin a small network [of BitTorrent users]", "the plausibility that each user downloaded a part from each other is very high." Declaration of Patrick Achache at para. 6. This is certainly true for a network of, say, five or ten concurrent users. However, the "plausibility that each user downloaded a part from each other" rapidly evaporates as the number of users becomes larger or as the users use BitTorrent at widely separated times. Both are true in this case. The number of users sued together in this case is in over one thousand and, according to the records submitted by Plaintiff, they allegedly used BitTorrent at different times over the course of four months.

14.    Both of these facts – the number of individuals named together and the different times of their alleged use of BitTorrent – make it highly implausible that all of 1,062 individuals sued jointly here uploaded or downloaded a part of the file from each other.

15.    As to the different times for download specifically, the various Defendants are alleged to have used BitTorrent to transfer the movie file at very different times over the course of four months, which makes it even less plausible that they all could have communicated with one another. Appendix A to Plaintiff's Complaint shows allegations of infringement on dates ranging from January 11, 2010 through May 5, 2010. Consistent with academic research on file-sharing using BitTorrent described below, this shows another reason why many individual defendants would never have communicated with other defendants: although some BitTorrent users may continue to share a file for a period of time after their download has completed, most do not.

16.    Empirical research shows that most BitTorrent users do not remain connected for very long after their downloads are complete. These statistics can be measured by means quite similar to the techniques employed by Plaintiff's experts here. One large study observed that only 3.1% of BitTorrent users stayed connected (to upload to others) more than ten hours after their downloads completed; only 0.34% stayed connected over 100 hours. J. A. Pouwelse, P.

Garbacki, D. H. J. Epema, and H. J. Sips, The BitTorrent P2P File-Sharing System:
Measurement and Analysis at 4 in PROCEEDINGS OF THE 4TH INTERNATIONAL WORKSHOP ON
PEER-TO-PEER SYSTEMS available at http://www.springerlink.com/content/l251rj12233u05l.

17.     Another study found that over 90% of users who successfully downloaded a file
remained connected for less than a single day, while many users who attempted to download the
file gave up entirely and disconnected within the first few hours. M. Izal, G. Urvoy-Keller, E. W.
Biersack, P. A. Felber, A. Al Hamra, and L. Garcés-Erice, Dissecting BitTorrent: Five Months in
a Torrent's Lifetime at 7, in PROCEEDINGS OF THE 5TH INTERNATIONAL WORKSHOP ON PASSIVE
AND ACTIVE NETWORK MANAGEMENT PROCEEDINGS OF THE 4TH INTERNATIONAL WORKSHOP
ON PEER-TO-PEER SYSTEMS, available a
http://www.springerlink.com/content/fg8hqw4136t0vtx9/.

18.     Thus, it is highly unlikely all or even a significant number of the defendants who
downloaded the subject copyrighted work here stayed on the network and became a source for
another later-connecting defendant to download from days or weeks later.

19.     At page 6 of its Statement of Good Cause, Plaintiff states that "each new file
downloader is receiving a different piece of the data from each user who has already downloaded
that piece of data." This statement could create two misconceptions about how BitTorrent
works. In fact, a downloader receives a given "piece" of the file from only one other user, not
from "each user" who has that piece. BitTorrent does not permit downloading a particular piece
of a file from more than one user at a time, although different pieces of the file can be
downloaded from different users. Also, a downloader does not communicate with "each user"
who is in possession of relevant data, but rather with some of the users in a limited, gradually
changing "peer set". As Plaintiff states, the peer set typically consists of "50 peers chosen at
random." Statement of Good Cause at p. 7.

20.     At page 9 of its Statement of Good Cause, Plaintiff states that "all of the events
involving all of the Doe Defendants are logically related to" the original infringer's decision to
start sharing a particular version of a motion picture, perhaps because the various Doe

5

Defendants all wanted to obtain the obtain it and could not have obtained that version without the original infringer's and others' decision to share it. Plaintiff then states that "this is significantly different from the prior cases involving copyright infringement via P2P systems" because in those systems "the infringer basically copied a work from one other user" at a time, rather than from several other users simultaneously.

21.     As I stated earlier, many other modern P2P systems do support swarming downloads akin to BitTorrent's, so it is hard to be confident that an "infringer basically copied a work from one other user" in the incidents at issue in prior file sharing litigation.

22.     In any case, in all peer-to-peer file sharing networks, particular files can become more widespread throughout the network over time as new users obtain them from earlier users. Indeed, researchers have been able to quantify and analyze the spread of particular files in particular networks over time. Regardless of whether particular acts of copying involve two users or a greater number of users, the availability of a file logically depends on the decision of its original distributor to make it available. So the "events involving" people who share a file in a file-sharing system are equally "logically related" (or unrelated) in this sense, regardless of what technology underlies the file-sharing system.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and that this document was executed in San Francisco, California.


By: s/Seth Schoen_____

Dated: February 4, 2011



199 Liberty St., SW<br/>Leesburg, VA 20175<br/>(877) 223-7212<br/>subpoena@dgwlegal.com

Friday, February 11, 2011

<u>VIA FIRST CLASS MAIL</u>



RE:  <u>COPYRIGHT INFRINGEMENT OF *THE HURT LOCKER* - Settlement Purposes Only Not Admissible Under FRE 408</u>
United States District Court for the District of Columbia
Civil Action No. <u>1:10-cv-00873-BAH</u>
Plaintiff: <u>Voltage Pictures, LLC</u>
Your IP Address:
Defendant Record No.:
ISP Providing Information:
Date and Time of Alleged Infringement:

Dear

Our law firm has filed a Federal copyright infringement lawsuit in the U.S. District Court for the District of Columbia on behalf of our client, Voltage Pictures, LLC. The suit was filed against 5,000 Doe Defendants. We subsequently obtained identifying contact information for many of these Defendants from their Internet Service Providers (ISPs). Your contact information was supplied to us by your ISP as one of the Defendants who has illegally obtained or shared our client's copyrighted motion picture through a peer-to-peer network *[Gnutella, BitTorrent etc.]*. We are sending you this letter as a courtesy before we are required to take more formal legal action, which could involve adding you as a named Defendant to this lawsuit or a lawsuit in your home jurisdiction.

According to our records, you have placed a media file that contains the copyright-protected film content for our client's motion picture entitled *The Hurt Locker* in a shared folder location enabling others to download copies of this content. In addition, we have evidence that the P2P client software that you used to obtain or share the film was _____ that your file hash factor (a mathematical function through which a file can be identified with certainty) _____ We also have obtained the file name of the movie, the file size and the GUID, all corresponding to an IP address that was assigned to your ISP account at the time the infringing activity occurred.

Copyright infringement (in this case obtaining a film without paying for it or sharing a film with others who have not paid for it) is a very serious problem for the entertainment industry. The law provides protection for copyright owners through the Federal copyright statute found at 17 U.S.C. §§ 501-506, which allows a copyright owner to impound infringing material, recover attorneys' fees, and seek damages of $750 - $150,000 per work, depending on the circumstances surrounding the infringement. While it is too late to undo the illegal file sharing, we have prepared an offer to enable the rights holder to recoup the damages incurred and defray the costs of preventing this type of activity in the future.

In exchange for a release of legal claims that will enable you to avoid becoming a named Defendant in a lawsuit, our firm is authorized to accept the sum of **$2,900** as full settlement for its claims. This offer will expire at 5pm EST on **March 11, 2011.** Thereafter, our client will accept no less than the sum of **$3,900** to settle this matter, but this increased settlement offer will expire on March 25, 2011. In addition, you must remove the file from the shared folder or location where our client's film can be shared or copied within three (3) days of paying a settlement. If you have chosen not to settle by March 25, 2011, we may add you to the list of Defendants to be served with a lawsuit.

You may pay the settlement amount by (a) a check mailed to our address shown in the top right corner of this letter (include the signed Conditional Release & Settlement Agreement with your payment, available for printing at www.copyrightsettlement.info); or (b) by credit card on our online settlement payment site, also located at


DUNLAP | GRUBB | WEAVER

www.copyrightsettlement.info. Once we have processed the settlement, we will return to you a confirmation by email that your payment has been processed and that you will not be named to a lawsuit.

We look forward to resolving this without further action on our part, however if you do not comply with the above requests we may be forced to name you as a Defendant to a lawsuit and proceed directly against you on behalf of our client. If forced to do so, our client will be seeking to recover the maximum amount of damages provided under the Copyright Act for copyright infringement, which is up to $30,000 per illegally downloaded film, plus attorneys' fees and costs of litigation. Because torrent file-sharing requires *deliberate* action by the uploader or downloader of a movie, we may be able to prove that your actions were intentional, rather than just negligent. In the event we are able to prove that the infringement was intentional, our client will be seeking the maximum statutory damages allowed by the Copyright Act in the amount of $150,000 per infringement, attorneys' fees and costs.

We feel that in light of the jury awards in recent cases, our client's settlement offer is extremely reasonable. For example, in the case of Capitol Records Inc., et al. v. Thomas-Rasset (D. Minn.) [Case No. 0:06-cv-01497-MJD-LIB], a jury awarded the plaintiffs $62,500 for each of the 24 songs the defendant was accused of illegally sharing, equaling a total award of $1.5 million. We think that by providing the Doe Defendants an opportunity to settle our client's claims instead of having to incur thousands of dollars in attorneys' fees and being at risk for a high jury verdict, our client is acting reasonably and in good faith.

*Please consider this letter to constitute formal notice that until and unless we are able to settle our client's claim with you, we demand that you not delete any media files from your computer.* If forced to proceed against you in a lawsuit, we will most certainly have a computer forensic expert inspect your computer in an effort to locate the subject movie file, or to determine if you have deleted any media files. If in the course of litigation the forensic computer evidence suggests that you did delete media files after being on notice of our client's claims, our client will add a spoliation of evidence claim against you. Be advised that if we were to prevail on this additional claim, the court could award monetary sanctions, evidentiary sanctions and reasonable attorneys' fees. If you are unfamiliar with the nature of this claim in this context, please consult an attorney and review the following cases: Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 77 U.S.P.Q.2d 1933 (E.D. Pa. 2005); U.S.C.A. Arista Records, L.L.C. v. Tschirhart, 241 F.R.D. 462 (W.D. Tex. 2006); and U.S. ex rel. Koch v. Koch Industries, Inc., 197 F.R.D. 488 (N.D. Okla. 1999).

We strongly encourage you to consult with an attorney to review your rights and risk exposure in connection with this matter. You should also visit the Frequently Asked Questions web page we have posted at www.copyrightsettlement.info, which will provide additional information and hopefully answer many of the questions you have. We thank you in advance for your anticipated cooperation in this matter, and we look forward to resolving our client's claim against you in an amicable fashion, through settlement.

Sincerely,

N. A. Kurtz, Esq., on behalf of
Dunlap, Grubb & Weaver, PLLC